## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**KBS, INCORPORATED**

      **Plaintiff,**

**v.**                              **Civil Action No. 3:04cv730**

**GREAT AMERICAN INSURANCE**
**COMPANY OF NEW YORK,**

      **Defendant.**

### <u>MEMORANDUM OPINION</u>

This matter is a declaratory judgment action that is before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1) on cross motions for partial summary judgment (docket entry nos. 10 and 23). 28 U.S.C. § 2201 *et seq*. On March 26, 2004, a fire damaged various buildings (the "Project") that were under construction in Richmond, Virginia, for which the Plaintiff, KBS, Incorporated, was the general contractor. (Compl. ¶¶ 6-7.) KBS had retained M&E Contractors, LLC ("M&E) to serve as an electrical subcontractor for the Project. <u>Id.</u> at ¶ 7.

The question before the Court is not one of ultimate liability, but rather whether certain insurance coverage applies. M&E procured two policies of insurance from Defendant Great American Insurance Company of New York ("Great American") as required by the subcontract between KBS and M&E, to which M&E was the named insured and KBS was an additional

insured.[1]  (Compl. ¶¶ 8-9.)  The subcontract between M&E and KBS contained an indemnity provision requiring M&E to indemnify KBS for any claims resulting from bodily injury or property damage arising out of or in connection with M&E's work performed on the Project. (KBS's Mem. Supp. Mot. Partial. Summ. J. ("KBS's Mem."), Ex. 1 (the "Subcontract"), Article VII.)

At least sixteen lawsuits have been filed against KBS and M&E (as well as various other parties) in state courts throughout Virginia seeking damages for property destruction or personal injury resulting from the fire.  (KBS's Mem. at 6-7.)  Pursuant to the insurance policies it issued, Great American concedes that it has a duty to defend KBS in these lawsuits.  (Great American Mem. Opp'n KBS's Mot. Partial Summ. J. ("Great American's Mem."), at 13.)  KBS, however, asks this Court to go one step further.  KBS moves this Court to declare, as a matter of law: (1) that Great American was obligated to provide to KBS a defense and investigation of all claims made against KBS regardless of whether litigation had already ensued; (2) that KBS is entitled to recover attorney's fees and expenses incurred prior to the filing of the first suit; and (3) that KBS is entitled to coverage under the Great American policies (in the combined amount of $6 million) for any liability of KBS as may be determined in the related litigation.  (KBS's Mem. at 18.) Great American opposes KBS's motion and asks for partial summary judgment to confirm that it was under no duty to investigate claims made against KBS before the filing of a claim, and that KBS's request for declaratory relief to confirm its entitlement to liability coverage is premature

---

[1] Federal jurisdiction on which the request for declaratory relief is based is predicated, in turn, upon the diversity of citizenship between KBS, a Virginia corporation, and Great American, which is incorporated in the State of New York; the amount in controversy (the coverage limits) exceeds the $75,000 jurisdictional minimum.  (Compl. ¶¶ 1-2, 4.)  Thus, jurisdiction is properly conferred on this Court pursuant to 28 U.S.C. § 1332(a).

-2-

because the issue of liability has not yet been determined.  (Great American's Mem. at 13-14.)

The parties have fully briefed the issues and the Court has entertained oral argument regarding the matter.  For the reasons set forth herein, the Court will GRANT Great American's motion and DENY KBS's motion for dispositive relief.

## Undisputed Facts and Stated Positions[2]

1.  KBS was the general contractor for the Project owned by RAMZ, LLC ("RAMZ") that was located in Richmond, Virginia.

2.  KBS retained M&E to serve as an electrical subcontractor for the Project.  (Compl. ¶ 7.)

3.  On Friday, March 26, 2004, a fire damaged the Project as well as surrounding buildings and vehicles.  (KBS's Mem. at 5; Great American's Mem. at 6.)

4.  The November 6, 2003 Subcontract between KBS and M&E required M&E to obtain insurance for the Project and to name KBS as an additional insured.  (The Subcontract, Attachment D, ¶ M.)

5.  The Subcontract between KBS and M&E contained an indemnity provision which reads:

> [M&E] agrees to defend, indemnify, save and hold harmless, [RAMZ]
> and [KBS] from and against the following: all claims, liabilities,
> demands, damages, losses, costs and expenses, including reasonable
> attorney's fees incurred, awards, fines and judgments, of every kind and
> nature whatsoever, including the obligations of [KBS] on account of any
> similar agreement [KBS] has with [RAMZ], "Claims" arising by reason
> of personal injury, the death or bodily injury to persons (including
> employees of [M&E]), design defects (if design originated from [M&E]),
> damages or destruction of property or the loss of use thereof, arising out
> of or alleged to have arisen out of in whole or in part, or in connection
> with, [M&E's] Work or the operations to be performed under this
> Subcontract, or, any act or omission of [M&E], its suppliers or lower tier
> Subcontractors, or anyone for whose act it may be liable.  [M&E]
> expressly so agrees that it assumes such indemnity obligation without
> limit and without regard to the cause or causes thereof and whether or not

---

[2]As specified in the parties' submissions.

said liability, claim, demand, loss, cost or expense arises in whole or in part from the acts or omissions (including the joint or concurrent, active or passive negligence) of [RAMZ] and [KBS], but excluding the sole and exclusive negligence or willful misconduct of [RAMZ] and [KBS].  This indemnification shall survive the Subcontract and be enforceable as a separate Subcontract.  This indemnity shall be applicable to any liability or claim, including the obligation of [KBS] on account of any similar indemnity agreement [KBS] has with [RAMZ].

(The Subcontract at 2, Article VII.)

6.      M&E obtained two policies of insurance from Great American.  Great American issued to M&E a primary policy (the "General Liability Policy") with limits of $1 million and an excess policy (the "Umbrella Policy") with limits of $5 million.[3]  M&E was the named insured, and KBS was an additional insured.  (Compl., Ex. B; KBS's Mem. at 3-5; Great American's Mem. at 3-4.)

7.      The General Liability Policy contains the following regarding Great American's duty to defend:

**SECTION 1 – COVERAGES**

**COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.      INSURING AGREEMENT**

a.      We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend any "suit"[4] seeking those damages.  However, we will have no duty to defend the Insured against any "suit" seeking damages for which "bodily injury" or "property damage" to which this insurance does not apply.  We may, *at our discretion*,

_____

[3] The policy coverage dates for both policies were July 15, 2003 – June 1, 2004.

[4] "Suit" is defined in the Policy as "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' or 'personal and advertising injury' to which this insurance applies is alleged." (General Liability Policy at 18.)

investigate any "occurrence"[5] and settle any claim or
"suit" that may result.

(General Liability Policy at 1) (emphasis added).

8.      Also of note is the following pertinent language provided in the General Liability Policy:

The insurance provided the additional Insured(s) is limited to liability
arising out of acts or omissions of the additional Insured(s) in connection
with their general supervision of "your work."

(Great American's Mem. at 4) (citing The Contractors Plus Commercial General Liability
Endorsement – Virginia Policy (the "Additional Insured Policy"), at 5.)

9.      M&E's Umbrella Policy (to which KBS is an additional insured) with Great American
contains the following regarding the duty to defend:

**III.   DEFENSE**

A.      We will have the right and duty to investigate any "claim"
and defend any "suit" seeking damages covered by the terms
and conditions of this policy when:

1.      the applicable Limits of Insurance of the underlying
policies listed in the Schedule of Underlying
Insurance and the Limits of Insurance of any other
insurance providing coverage to the "Insured" have
been exhausted by actual payments of "claims" for
any "occurrence" to which this policy applies; or

2.      damages are sought for an "occurrence" which is
covered by this policy but not covered by any
underlying policies listed in the Schedule of
Underlying Insurance or any other insurance
providing coverage to the "Insured."

D.      In all other instances except subsection **A**. in Section **III.
Defense,** we will not be obligated to assume charge of the
investigation, settlement or defense of any "claim" or "suit"
against the "Insured."  We will, however, have the right and

_____

[5] "Occurrence" means "an accident, including continuous or repeated exposure to
substantially the same general harmful conditions."  (General Liability Policy at 17.)

> will be given the opportunity to participate in the settlement, defense and trial of any "claim" or "suit" relative to any "occurrence" which, in our opinion, may create liability on our part under the terms of this policy.  If we exercise such right, we will do so at our own expense.[6]

(Umbrella Policy at 3.)

10.    Subsequent to the fire, various parties made demands on KBS and alleged that KBS and its subcontractors (including M&E) were negligent; that KBS negligently supervised various subcontractors; and that their negligence caused the fire which resulted in the wrongful death of a nearby resident, Ms. Marian Jefferson Jackson, as well as damage to real and personal property.  (KBS's Exs. 8-40.)

11.    On April 15, 2004, KBS made demands on M&E for its defense and the investigation of the wrongful death and personal injury claims.  (KBS's Mem. at 6, Ex. 2.)[7]  KBS reasserted its demand on M&E (by way of M&E's counsel) and Great American on May 4 and May 26, 2004, when it had not received any response to its earlier demand(s).  (Id. at 7, Exs. 3, 4.)

12.    On June 8, 2004, the Estate of Marian Jackson (the "Estate") informed KBS of its intention to file a wrongful death action.  (KBS's Ex. 59) (Donald McEachin, Esq. stating his "intention to file suit on behalf of the Estate of Marian Jefferson Jackson.").

13.    On June 10, 2004, Great American declined to assume KBS's defense at that time. (KBS's Mem. at 6 and Ex. 5; Great American's Mem. at 7.)

14.    On June 14, 2004, KBS informed Great American of the forthcoming wrongful death action.  (KBS's Mem. at 6; Great American's Mem. at 8.)

15.    On July 9, 2004, the Estate filed a wrongful death action in the Circuit Court of Charles City County, Virginia against KBS, M&E, and others (the "wrongful death action").  (See KBS's Mem. at 6 and Ex. 41; Great American's Mem. at 8.)

---

[6] Accordingly, Great American's duty to investigate a claim pursuant to the Umbrella Policy would not arise until all underlying insurance polices had first been exhausted.

[7] In its Motion for Partial Summary Judgment, KBS alleges that the April 15 demand letter was sent to *both* M&E *and* Great American.  However, KBS's Exhibit 2 conclusively demonstrates that the demand was only sent to M&E's representatives, and not to Great American.  Thus, the more accurate statement is that, on April 15, KBS made a demand on M&E for its defense and the investigation of the pending wrongful death and personal injury claims. (Great American's Mem. at 6.)

16.    On December 17, 2004, Great American accepted KBS's tender of the defense of the wrongful death action brought by the Estate.  (KBS's Mem. at 6, Ex. 7; Great American's Mem. at 8.)  Thus, Great American is currently providing a defense to the pending state court wrongful death action, in addition to fifteen other lawsuits.  (Great American's Mem. at 8.)

17.    Numerous claims for property damage have also been made against KBS as the result of damage resulting from the fire.  (See KBS's Exs. 41-56.)

18.    On April 15, 2004, counsel for KBS forwarded a letter to M&E's representatives stating that the potential allegations would likely include claims that day laborers hired by M&E for the cleanup of the Project caused the fire by sweeping cigarette buts into a trash chute. (KBS's Mem. at 8.)

19.    An April 20, 2004, letter from Mr. McEachin (the Estate's counsel) to KBS identified KBS as "a defendant."  (See KBS's Mem. at 8 and Ex. 58; Great American's Mem. at 10.) The letter did not address whether KBS's sole negligence was, or was not, the cause of the fire.

20.    KBS claims that no one has asserted that KBS's sole negligence was the cause of the fire. (KBS's Mem. at 8.)  Great American believes, however, that the allegations made, regardless of when suit may have been initiated by the Estate, "clearly show a claim for the sole negligence of KBS [] as the cause of the fire."  (Great American's Mem. at 10-12.)

21.    KBS alleges that Great American was obligated to defend and investigate the claims made against KBS arising from the fire, and that this duty arose when the claims were made. (KBS Mem. at 2.)  Thus, KBS claims that Great American's refusal to accept the tender of the wrongful death claim in advance of suit while doing so for M&E was inconsistent with its obligation to treat, on an equal basis, both its named insured (M&E), and its additional insured (KBS).  (KBS's Mem. at 2.)

22.    Great American concedes that it has a duty to defend KBS as a result of the lawsuits filed against it in which KBS is alleged to have been negligent in relation to the fire.  (Great American's Mem. at 13.)

23.    KBS is a named insured in a commercial general liability policy underwritten by St. Paul Fire & Marine Insurance Company.  KBS is also a named insured in a commercial umbrella policy underwritten by AIG/National Union Fire Insurance Company.  Both policies periods cover the date on which the fire occurred (March 26, 2004).  (Great American's Mem. at 16.)  Neither insurance company is a party to the present federal action.

25.    KBS argues that it is entitled to:  (1) a declaration that Great American was obligated to

defend and to investigate the wrongful death claim in advance of the filing of the lawsuit, and that Great American is obligated to investigate and defend all property damage claims, whether or not in suit; (2) a declaration that KBS is entitled to recover attorney's fees and expenses incurred prior to the filing of the first suit; and (3) a determination that Great American's two policies of insurance are KBS's primary and excess policies, *i.e.*, KBS is entitled to the exhaustion of these two policies as KBS's first two sources of indemnity coverage against all claims arising from the fire before addressing other possible coverage. (KBS Mem. at 2, 18.)

## **Standard of Review**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering whether to grant a motion for summary judgment, the court must assess the evidence offered by both parties and "determine whether there is a genuine issue for trial" after viewing the evidence in the light most favorable to the non-moving party and resolving all factual disputes in that party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Since this Court is faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits.  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).  When considering each motion, the Court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing that motion.  Id. (citation omitted).

To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In essence, the Court must decide if

-8-

the evidence when viewed in the light most favorable to the non-moving party "presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.  Resolution of the instant matter is "especially appropriate...because the construction of insurance contracts is a legal question well suited for resolution by the court." W. Am. Ins. Co. v. Johns Bros., Inc., 435 F. Supp. 2d 511, 513-14 (E.D. Va. 2006) (citation omitted).

## Analysis

**1. Great American Was Not Obligated to Provide to KBS an Investigation of Claims Made Against KBS Prior to a Claimant's Filing of a Lawsuit Against KBS.**

Whether Great American owed KBS a duty to investigate a claim prior to the filing of a lawsuit primarily depends on whether such language was unambiguously provided for in the subject insurance policies.  The parties agree that Virginia law controls.[8]

Under Virginia law, it is a function of the court to construe the language of the insurance policy as written, without reforming the contract different from that plainly intended by the parties, thus creating a liability not originally assumed by the insurer.  See Pilot Life Ins. Co. v. Crosswhite, 145 S.E.2d 143, 146 (Va. 1965) (citations omitted).  Indeed, courts cannot apply a

---

[8] Where, as here, subject matter jurisdiction is premised on diversity of citizenship, this Court must apply the substantive law of the forum state.  See Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 623-24 (4th Cir. 1999) (citation omitted).  Under the law of the forum state (Virginia), "the law of the place where an insurance contract was written and delivered governs questions of insurance coverage."  See Buchanan v. Doe, 431 S.E.2d 289, 291 (Va. 1993) (citation omitted).  Because it is reasonable to infer (and is not contested by the parties) that the insurance contracts in issue were delivered to the insureds in Virginia, Virginia law governs in this matter.  Accord Transcon. Ins. Co. v. Caliber One Indem. Co., 367 F. Supp. 2d 994, 1001 n. 6 (E.D. Va. 2005).

"strained or unjustified construction of [an insurance] policy..., which disregards the plain meaning and intent of the parties...." See Quesenberry v. Nichols, 159 S.E.2d 636, 640 (Va. 1968) (citation omitted).

Controlling Virginia law is clear and well-settled on the governing standard for interpreting contracts, including insurance policies: Virginia strictly adheres to the "plain meaning" rule, meaning that "where an agreement is complete on its face and is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself...because the writing is the repository of final agreement between the parties." See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 405 (4th Cir. 1998) (quoting Lerner v. Gudelsky Co., 334 S.E.2d 579, 584 (1985)). Thus, the analysis properly begins with the language of the policy and must end where, as here, the pertinent policy language has a clear and unambiguous plain meaning. Gulf Underwriters Ins. Co. v. KSI Servs., Inc., 416 F. Supp. 2d 417, 420 (E.D. Va. 2006).

Pursuant to the General Liability Policy in this case, Great American had the *discretion*, but not the obligation, to investigate a claim prior to the filing of a suit. The Policy specifically provides that

> [Great American] may, *at our discretion*, investigate any "occurrence"
> and settle any claim or "suit" that may result.

General Liability Policy at 1 (emphasis added). The language in the General Liability Policy is plain and unambiguous and, construing the language of the policy as written, see Crosswhite, 145 S.E.2d at 146, any duty of Great American to defend KBS did not include the concurrent obligation to investigate a claim prior to the filing of a lawsuit against KBS. Construing the

language otherwise would "create a liability not assumed by the insurer," see id., an interpretation clearly impermissible under Virginia law.  Therefore, Great American was under no duty to perform a pre-litigation investigation as demanded by KBS before any claims were filed against KBS.

Such a conclusion finds firm support in Virginia law, for whether an insurer is obligated to defend an action requires a court to examine not only to the policy language, but also to compare the policy language with the related underlying complaint to determine whether the claims alleged are covered by the policy.  See Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir.) (citations and quotation marks omitted) (applying Virginia law), cert. denied, 126 S. Ct. 568 (2005).  The duty to defend "arises whenever *the complaint* alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy. Brenner v. Lawyers Title Ins. Corp., 397 S.E.2d 100, 102 (Va. 1990) (emphasis added).  As no complaint or pleading was filed by the time a pre-litigation investigation was demanded by KBS, Great American was not required to oblige KBS.

While no Virginia court has directly addressed the issue of whether an insurer has a duty to investigate a claim before suit has been filed, courts in other jurisdictions have held that, unless the policy provides otherwise, an insurer has no such obligation.  See Morrell Constr., Inc. v. Homes Ins. Co., 920 F.2d 576, 580 (9th Cir. 1990) (applying Idaho law) (in a policy explicitly leaving investigations to the discretion of the insurer, the court refused to impose such a duty on the insurer because the court could not "rewrite the parties' insurance policy via tort law to impose an obligation on an insurer to investigate a claim before a third party files suit."); Hyde Athletic Indus., Inc. v. Cont'l Cas. Co., 969 F. Supp. 289, 307-08 (E.D. Pa. 1997) ("An insurer

determines its obligations to defend its insured in a lawsuit by looking at the complaint.  There is no bad faith in failing to investigate the underlying facts.") (citation omitted); Ramsey v. Interstate Insurors, Inc., 365 S.E.2d 172, 175 (N.C. Ct. App.) (concluding that "in the absence of any evidence that the policy so required, we reject the Ramseys' contentions that the insurer had a duty to investigate the accident...without any suit having been filed...."), *review denied*, 370 S.E.2d 248 (N.C. 1988).  Accordingly, the Court concludes that unless the subject policies provide to the contrary, Virginia would adopt the reasoning and holdings of *Morrell*, *Hyde Athletic*, and *Ramsey* to conclude that an insurer is under no duty to investigate a claim before suit is filed.

Finding no such compulsory language in the Policies in this case, and because this Court is not at liberty to "disregard[] the plain meaning and intent of the parties" authorizing, but not obligating, Great American to perform pre-litigation investigation, Quesenberry, 159 S.E.2d at 640, and given that no such independent duty exists in Virginia case law, the Court is compelled to hold that Great American was not obligated to provide the requested investigation prior to the filing of a lawsuit against KBS.

Moreover, there is no reason to believe that Great American abused its discretion in declining to conduct an investigation prior to the filing of the first lawsuit against KBS.  While it is true that Great American chose to provide counsel to M&E without doing the same for KBS, evidence submitted by both parties justifies such an exercise of discretion.  The fire generated widespread media attention across the central Virginia region, and published newspaper articles quoted various sources as suggesting that M&E's workers were at fault in causing the fire. (KBS's Mem., Ex. 57.)  In addition, as urged by KBS's counsel at oral argument, it would have been difficult, if not impossible, for Great American to conduct an investigation for the joint benefit of

both M&E and KBS because of the potential adversarial relationship likely to occur given the

prospect of certain litigation.  Under such circumstances, Great American's refusal to perform a

pre-litigation investigation for KBS was not improper.

## 2.  KBS Is Not Entitled to Recover Attorney's Fees and Expenses Incurred Prior to the Filing of the First Lawsuit.

As to whether the Court may declare that KBS is entitled to recover its attorney's fees and

expenses incurred prior to the filing of the first suit, such a request likewise finds no support in the

language of the General Liability Policy.  If anything, the plain Policy language refutes KBS's

assertion.  Indeed, the Policy specifically provides that "[n]o insured will, except at that Insured's

own cost, voluntarily make a payment, assume any obligation, or *incur any expense*, other than for

first aid, *without our consent*."  General Liability Policy at 13 (emphasis added).  Moreover, the

Policy also requires Great American to pay "[a]ll reasonable expenses incurred by the insured *at

[Great American's] request* to assist [Great American] in the investigation or defense of the claim

or 'suit'...."  Id. (emphasis added).  Great American did not consent to or request that KBS incur

any fees or costs prior to the filing of the lawsuit.  (Great American's Mem. at 16.)  And,

moreover, since the Court has held that Great American was under no duty to perform a pre-

litigation investigation, KBS cannot recover for expenses incurred for such an investigation.

Thus, in accordance with the controlling Policy language, KBS may not recover its attorney's fees

and expenses incurred prior to the filing of the lawsuits.

## 3. This Court is Unable to Determine Entitlement to Insurance Coverage at This Time

In its final request for relief, KBS asks this Court to declare that KBS is entitled to

coverage under the Great American policies for any liability of KBS as may be determined in the underlying state court litigation.  (KBS's Mem. at 18.)  KBS, perhaps recognizing the unambiguous language of the Policy, seeks to circumvent the discretion otherwise given to Great American by attempting to bootstrap the underlying obligations imposed on KBS and M&E in their subcontract into the obligations imposed upon M&E and Great American in the respective insurance policies.  Citing St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., 365 F.3d 263 (4th Cir. 2004), KBS argues that the indemnity provision in the subcontract (requiring M&E to indemnify KBS against claims and demands) is incorporated by reference into Great American's insurance policies by the "insured contract" language of the policies.  (KBS's Mem. at 12.)

Article VII of the Subcontract between KBS and M&E contains a standard indemnity provision which requires M&E to:

> "defend, indemnify, save and hold harmless,...[KBS] from and against the following: all *claims, liabilities, demands, damages, losses, costs and expenses, including reasonable attorneys' fees incurred, awards, fines and judgments, of every kind and nature whatsoever*, including..."Claims" arising by reason of personal injury, the death or bodily injury to persons....or destruction of property or the loss of use thereof, arising out of or alleged to have arisen out of in whole or in part, or in connection with, [M&E's] Work or the operations to be performed under this Subcontract, or, any act or omission of [M&E]...or anyone for whose act it may be liable.

The Subcontract at 2, Article VII (emphasis added).  Thus, the Subcontract between KBS and M&E requires M&E to indemnify KBS for claims (including eventual liabilities) resulting from personal injury, death or bodily injury, or for the destruction of property arising out of or in

-14-

connection with M&E's negligent work performed on the Project.

KBS asserts that this indemnity provision is incorporated by reference into the insurance policies issued by Great American to M&E (as the named insured) and KBS (as the additional insured). However, the governing General Liability Policy provides that the "bodily injury" or "property damage" to which M&E is obligated to pay damages by reason of the assumption of liability in a contract or agreement is *excluded* from coverage under the Policy *unless* the liability for damages is "assumed in a contract or agreement that is an 'insured contract'; provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement." General Liability Policy at 2 (emphasis added). Section V of the General Liability Policy defines an "insured contract" as, among other things:

> ...
>
> f.     that part of any other contract or agreement pertaining to your business...under which you assume the tort *liability* of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means *a liability* that would be imposed by law in the absence of any contract or agreement.

General Liability Policy at 16 (emphasis added).[9] Relying on such provisions, KBS argues that the Subcontract is an "insured contract" as that term is used in the Policies, and that since KBS and M&E executed the Subcontract nearly five months before the date of the fire, Great American is obligated to indemnify KBS for any "bodily injury" or "property damage" claims that have been asserted against KBS as a result of the fire. (KBS's Mem. at 12.) KBS concludes as follows: "KBS has made demand on Great American sufficient to obligate Great American to defend and

---

[9] The Umbrella Policy contains similar language regarding the exclusion from coverage of liability assumed in an "insured contract," and defines the term "insured contract" similarly.

indemnify KBS based on the subcontract and the 'insured contract' provisions of the [P]olicies. The obligation of Great American to KBS is the same as the obligation of M&E under the indemnity clause of the [S]ubcontract." (KBS's Mem. at 14.) Although the argument is innovative, it nonetheless lacks merit.

The "insured contract" definition limits any indemnity provision in an agreement to "tort liability of another party to pay for 'bodily injury' or 'property damage.'" General Liability Policy at 16. However, the applicable Great American policy defines "tort liability" as "a liability that would be imposed by law in the absence of any contract or agreement." Id. To constitute an "insured contract" then, the contract must assume an actual tort liability. Accordingly, if a claim is made against KBS which does not provide a basis for tort liability, then there is no insured contract status pursuant to the express definition of "insured contract" in the applicable Great American policy.

Various claims have been filed in Virginia circuit courts against KBS, M&E, and others. The allegations include claims made against KBS and M&E collectively, while still others assert that KBS is liable for damages as a result of its own, sole negligence. (See KBS's Exs. 41-56.) This latter claim, if determined to have merit either by way of settlement or trial judgment, would be excluded from coverage under the Policies. See The Subcontract at 2, Article VII; Great American's Mem. at 4. It is the lack of finality regarding the ultimate liability issue, however, that precludes this Court from making a coverage determination for any liability incurred in the pending state court actions. Certainly, Great American is obligated to *defend* KBS in the underlying state court lawsuits, for the complaints in those suits allege facts which have the potential of stating claims that would be covered by the applicable policies. See Fuisz v. Selective

Ins. Co. of Am., 61 F.3d 238, 245 (4th Cir. 1995) (applying Virginia law and noting that "where

both covered and excluded acts are alleged, the duty to defend attaches.") (citations omitted).

However, the duty to defend is broader than the duty to *indemnify*, see Brenner, 397 S.E.2d at 102,

and the duty to indemnify (unlike the duty to defend) depends on the *resolution* of facts alleged in

the complaint, Penn-America Ins. Co. v. Coffey, 368 F.3d 409, 413 (4th Cir. 2004) (applying

Virginia law).  Such facts and issues which will answer the question of whether Great American is

under a duty to indemnify (and therefore provide coverage for) KBS are not currently before the

Court.  These various complaints make allegations against KBS which, if true, would impose

upon Great American an indemnification obligation to KBS or, if not true, could just as easily

eliminate any such obligation.

To be an "insured contract" under the Policies in this case, the indemnity agreement must

assume an actual tort liability.  But if a claim is made against KBS which does not provide a basis

for tort liability, then there is no insured contract status under the definition of an "insured

contract" in the Policies, and Great American would have no duty to indemnify KBS.  The Court

simply cannot make a coverage determination at this time.[10]

It is for similar reasoning that the rationale of St. Paul, *supra*, does not apply.  In St. Paul,

the owner of a vacation resort, VMS Lansdowne Limited Partnership (the "Owner"), entered into

a management agreement with Benchmark Management Company (the "Operator").  365 F.3d at

266.  Under the agreement, the Owner agreed to indemnify the Operator for liability arising out of

---

[10] Additionally, as Great American emphasizes, not all of the necessary parties are before
the Court to resolve the ultimate issue of liability and to join them would unnecessarily interfere
with the pending state court proceedings and would delay resolution.  (Great American's Mem. at
23.)

-17-

its negligence, and the Operator agreed to indemnify the Owner for liability arising out of its gross negligence, fraud, or willful conduct.  Id. at 273.  The Owner met its obligations to provide primary and excess comprehensive general liability insurance.  Id. at 266.  The Owner was the named insured in those policies, which extended coverage to the Operator as the Owner's "real estate manager."  The Operator likewise purchased coverage.  All insurance policies contained "other insurance" clauses.

One of the resort's guests became ill, allegedly as a result of food poisoning, and filed suit against the Owner and the Operator (defendants).  Id. at 265.  The litigation settled for $4 million, of which the insurers contributed $3 million.  Id. at 265-66.  The defendants' insurers then joined in a declaratory relief action to determine issues of coverage and expense allocation.  The district court concluded that all of the Owner's and Operator's insurers were obligated to contribute to the settlement.  The Operator's insurers appealed, contending that they were not liable for any portion of the settlement.  The Fourth Circuit agreed and reversed, concluding that the incident of alleged food poisoning was caused by ordinary negligence, which, under the indemnity provision in the management agreement, made the Owner liable to the Operator.  Id. at 270-77.  As the court explained:

> "[The Operator's insurers] argue that the [Owner's insurance] policies must respond first to satisfy the settlement because the [management agreement] requires [the Owner] to indemnify [the Operator]....  In this regard, [the Operator's insurers] rely on cases that give priority to indemnification agreements between the insured[s] in assessing the respective obligations of the insurers and hold that such agreements may prevent the indemnitee's insurer from being liable for a settlement arising from a covered loss, notwithstanding the existence of an 'other insurance' clause in the indemnitor's insurance policy....
>
> "We agree with [the Operator's insurers]....[W]e conclude that the

indemnification provisions [in the Owner-Operator agreement] control the allocation of liability between the insurers in this case because it results in [the Owner] having responsibility for the [Operator's share[] of the settlement....

"[A]ll indications are that most, if not all, jurisdictions to have faced the question of whether an indemnification agreement could relieve particular insurers of an obligation to pay...have answered in the affirmative....

"[W]e believe that the cases and principles relied on in Wal-Mart Stores[, Inc. v. RLI Ins. Co., 292 F.3d 583 (8th Cir. 2002)],[11]...represent general practices and the majority position on the respective issues."

St. Paul, 365 F.3d at 270-72 (internal quotation marks and citations omitted).

In a recent case, the Fourth Circuit summarized the holding and application of St. Paul as

follows:

...*before* the insurance coverage could be determined and allocated, the liability of the insureds needed to be determined, including contractual liability created by an indemnification clause between two of the insureds. [St. Paul, 365 F.3d] at 268. When the analysis for underlying liability was conducted, it was determined that final responsibility for the food poisoning was shifted by reason of an indemnification clause from the insured of one insurance company to the insured of another. We held therefore that coverage followed, because the insurance covered the liability of the insureds as determined not only by law but also by application of their indemnification agreements. As we said, "An indemnity agreement between the insureds or a contract with an indemnification clause...may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." Id. at 270-71 []. Thus, responsibility for insurance coverage followed the

---

[11] In Wal-Mart, the Eighth Circuit predicted that Arkansas would follow the growing trend of jurisdictions that allowed valid, enforceable indemnification agreements to "determine the allocation of liability in an insurance dispute." 292 F.3d at 588. In acknowledging the "well-recognized" principle applied in Wal-Mart, the Fourth Circuit in St. Paul also adopted the general rule that "an indemnity agreement between insureds or a contract with an indemnification clause...may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." St. Paul, 365 F.3d at 270-71 (citations omitted).

liability of the insureds.

<u>Travelers Prop. Cas. Co. of Am. v. Liberty Mut. Ins. Co.</u>, 444 F.3d 217, 224 (4th Cir. 2006).

St. Paul is distinguishable from the present case.  As the <u>Travelers</u> case makes clear, *before* insurance coverage can be determined and allocated, the liability of the insureds must first be determined.  <u>Id.</u> at 224.  The court in <u>St. Paul</u> had the benefit of a settlement agreement between the insurers which afforded the court the ability to determine the collective liability of the insurers.  <u>St. Paul</u>, 365 F.3d at 267, 269.  In the present case, however, there is no way to apportion liability because liability has not yet been determined.  Thus, the <u>St. Paul</u> analysis does not apply.  The consequence of declaring that KBS is entitled to primary coverage under Great American's General Liability Policy, and then to coverage under Great American's Umbrella Policy, both in the combined amount of $6 million, would subject Great American to the possibility of providing indemnity insurance coverage under a circumstance which does not trigger indemnity insurance coverage for KBS from Great American under the applicable Policies, *i.e.*, where KBS is found to be solely negligent.  Indeed, once the liability of KBS and M&E in the underlying lawsuits is determined, a court will then look to the insurance policies for coverage of liability and perform the <u>St. Paul</u> analysis.  <u>See</u> <u>Travelers</u>, 444 F.3d at 225.

Therefore, without the benefit of a settlement or liability determination at this juncture in the underlying state proceedings, this Court is unable to determine whether KBS is entitled to primary coverage and excess coverage under the Great American Policies in the combined amount of $6,000,000.

**4.  In Spite of the Pending State Court Proceeding, This Court May Nonetheless Entertain**

**the Current Declaratory Judgment Action**[12]

As an alternative argument, Great American argues that this Court should not exercise jurisdiction over this matter because of the pending actions against KBS (and others) in Virginia state courts.  The federal declaratory judgment statute, 28 U.S.C. § 2201(a),[13] entrusts the granting of declaratory relief to the discretion of the district court.  See 28 U.S.C. § 2201; see also Great Am. Ins. Co. v. Gross, No. 05-2069, ___ F.3d ___; 2006 U.S. App. LEXIS 26920, at * 28-29 (4th Cir. Oct. 30, 2006) (citations omitted).  To determine whether to proceed with a federal declaratory judgment action when a parallel state court action is pending, the court should consider four factors in deciding whether to abstain:

> (1) whether the state has a strong interest in having the issues decided in its courts; (2) whether the state court could resolve the issues more efficiently than the federal court; (3) whether the presence of overlapping issues of fact or law might create unnecessary entanglement between the state and federal court; and (4) whether the federal action is mere procedural fencing in the sense that the action is merely the product of forum shopping.

Id. at *33 (citing Nautilus Ins. Co. v. Winchester Homes, Inc., 15 F.3d 371, 377 (4th Cir. 1994)). Analysis of the four "Nautilus factors" supports the conclusion that this Court may entertain the present insurance coverage dispute notwithstanding the ongoing litigation in state court.

---

[12] Even though Great American would presumably withdraw its objection to this Court's exercise of jurisdiction in light of the fact that it has prevailed, this Court deems it appropriate to consider, *sua sponte*, whether it should abstain where it does not desire to interfere with state court prerogative.

[13] The Act provides in part: "In a case of actual controversy within its jurisdiction,...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.

First, there does not exist a compelling state interest in having the issues raised in this action decided in the Virginia state courts.  Even though the issues of insurance coverage raised here are governed by the substantive law of Virginia, and even though there are Virginia state cases pending, these facts alone do "not provide a justification for declining to exercise federal jurisdiction" unless the questions of state law raised in this federal action are "difficult, complex, or unsettled."  Gross, 2006 U.S. App. LEXIS 26920, at * 34 (citing Nautilus, 15 F.3d at 378)).  Indeed, as was the case in Gross, the questions of state law raised here involve the "routine application of settled principles of insurance law to particular disputed facts."  Gross, 2006 U.S. App. LEXIS 26920, at 34.  "Virginia's interest in having those issues decided in its own courts, which is no stronger than it is in any case in which a federal court has jurisdiction over a claim in which state law provides the rule of decision, is not sufficiently compelling to weight against the exercise of federal jurisdiction."  Id.

Second, the various state courts are not in any better position to efficiently resolve the issues presented here than is this Court.  The basic dispute here involves insurance coverage and is comparatively more limited in scope than the proceedings in state court.  Id. at *35.  Insurance coverage issues (and particularly those of the duty to defend and/or the duty to indemnify), so far as this Court is aware, are not directly raised in the pending state court proceedings, which involve entirely separate and independent questions of tort liability.  Id. at *35-36.

Regarding the third factor, permitting this federal action to go forward would not result in the unnecessary entanglement between the federal and state court systems.  Indeed, the facts and legal issues raised in the liability proceedings in state court are not raised in this federal litigation.  Again, the issue to be determined here is insurance coverage, not liability, which involves distinct

factual and legal issues and principles.

Finally, this Court cannot conclude that the federal case is being used as a device for procedural fencing.  Again, the issues raised are not the same as those raised in the pending state court actions; thus, this is not a case "in which a party has raced to federal court in an effort to get certain issues that are already pending before the state courts resolved first in a more favorable forum...."  Id. at *36-37.  Similar to Gross, "[t]his action was filed in an entirely proper effort to obtain prompt resolution of a dispute over a liability insurer's obligation to its insureds," id. at * 37, and to (eventually) resolve the issues of coverage and apportionment.  This dispute is separate and independent from the ongoing litigation in Virginia state courts.

Therefore, the Court cannot abstain from entertaining the claims raised in KBS's complaint.  This conclusion finds firm support in Fourth Circuit precedent where the court has "frequently approved the use of federal declaratory judgment actions to resolve disputes over liability insurance coverage, even in advance of judgment against the insured on the underlying claim for which coverage is sought."  Nautilus, 15 F.3d at 375-76 (citing White v. Nat'l Union Fire Ins. Co., 913 F.2d 165, 167-69 (4th Cir. 1990); Stout v. Grain Dealers Mut. Ins. Co., 307 F.2d 521 (4th Cir. 1962); and Farm Bureau Mut. Auto. Ins. Co. v. Daniel, 92 F.2d 838 (4th Cir. 1937)).

Accordingly, Great American's Motion for Partial Summary Judgment must be GRANTED, and KBS's Cross-Motion for Partial Summary Judgment must be DENIED.[14]

---

[14] KBS's complaint stated causes of action for both declaratory relief and for breach of the primary and excess insurance contracts issued by Great American.  (See Compl. at 5-6.)  The latter cause of action was based on Great American's alleged failure to provide a defense to KBS pursuant to the insurance policies.  (Id. at 5, ¶¶ 24-28.)  Great American concedes, however, that

An appropriate Order shall issue.


_____/s/_____

Dennis W. Dohnal

 United States Magistrate Judge



Dated: 11/7/06

---

it is and has been providing a defense for KBS in the underlying state court lawsuits. (Great American's Mem. at 13.) Therefore, this request for relief is rendered moot. Furthermore, Great American's objections to KBS's proffer of evidence are also rendered moot given the Court's resolution of the dispositive issues which necessarily depended on policy language that has gone unchallenged as to admissibility for purposes of resolving the pending motions. (Great American's Mem. at 2-3.) As such, KBS's motion for partial summary judgment requesting the aforementioned declaratory relief, and Great American's own cross-motion for partial summary judgment opposing the same can be interpreted as motions seeking complete, rather than partial, dispositive relief. There being no issues remaining for the Court to determine, and given Great American's success in obtaining dispositive relief, the matter will be dismissed and the case closed.